LEIGH M. CLARK, Retired Circuit Judge.
On a trial on an indictment charging this appellant with murder, a jury found him guilty of manslaughter, and the court sentenced him to imprisonment for ten years.
In appellee’s brief, there is an acknowledgment that “The Statement of the Pacts as set forth in Appellant’s brief is substantially correct and is adopted herein by reference.” We deem it appropriate to quote the following first two paragraphs of appellant’s brief:
“On December 10, 1982, Ms. Fannie Hoffman was living in Macon County, Alabama, in a trailer. Mr. Bennie Cole, the deceased, came by Fannie’s trailer first when he got off work, then left to go hide his car because he didn’t want anybody to see it, and then returned to the trailer around 10:30 p.m. The couple then began making love. Shortly afterward, the defendant, Ned Johnson, arrived at the trailer. Ned came into the trailer and knocked at the bedroom door. Fannie said she would be a few minutes and Bennie Cole hid in the closet. Fannie took her baby to her Mother’s house which was near the trailer. Fannie heard a shot and then Ned appeared at her Mother’s door and said he had shot Bennie and to call for help. Several people arrived to help Bennie.
“Fannie had been going with Ned for about two (2) years and in response to the State’s question, testified that she ‘had never heard him (Ned) accuse me of going with him (Bennie)’. She testified that when she returned to the trailer Bennie was dead and on the floor. Fannie, the deceased, and the defendant, all grew up in the same neighborhood and were friends. Fannie and Ned had talked about getting married. Ned had left clothes and a jacket at her trailer earlier.”
There was considerable testimony that defendant was disabled, was smaller than the alleged victim, that defendant had a bad leg and a bad back and commenced using crutches a short time before the alleged homicide. Another paragraph of the brief of counsel for appellant states:
“The Defendant, Ned Johnson, testified that he was injured by an automobile and stayed in the hospital three (3) years and did not walk for five (5) years. He drew Social Security for about eleven (11) years. Ned and Cole grew up together, lived within 100 feet of each other, and were best of friends. Ned and Fannie *984 Hoffman were dating and talking about getting married.”
The defendant testified at length on the trial. He said that he and Fannie Hoffman had had a telephone conversation in which it was understood between them that he was to come to Fannie Hoffman’s trailer, park his automobile in front of the trailer and the following occurred, according to his testimony:
“Q. And then what did you do?
“A. First I got out of the car. I went up on the first, on the steps first, knocked on the door. Then I left off the front door, went in the back and opened the back door. The back door.
“Q. What did you do then?
“A. Went up the hall, turned the lights on in the living room.
“Q. Were there any lights on in the trailer?
“A. No, there was no light on in the trailer. I turned the lights on.
“Q. All right. Then what happened?
“A. After I turned those lights on, I only turned one light on, that’s the living room, that reflects enough light down the hallway. I went to the hallway, knocked at Fannie’s door and she said who was it and I told her me and she said, ‘just a minute.’ I went back up, sat on the couch, took her so long I went back down, knocked on the door again. She said, ‘I’ll be out in just a minute. I went back up the hallway, stood up in the hallway. Then she came out the door. She shut her door back, came out the door and went up, went in the hallway and went up, out the back door.
“Q. Did she say anything to you after she left the bedroom?
“A. She just said she was going up to her Mother’s. And, that’s what I thought, she was going up to her Mother’s and she’d be right back.
“Q. And, so she left the trailer out on the back door and went up to her Mother’s house?
“A. That’s right.
“Q. O.K. And what happened next?
“A. What happened after that, I turned the hallway light on. I went in her bedroom, there’s enough light reflecting out of that hallway to show into her bedroom. So, after I went in there I opened the closet and Bennie was in the closet. Bennie jumped out choking me.
[[Image here]]
“Q. Y’all were moving around?
“A. I was still trying to push him off me.
“Q. All right. Did you know who he was at that time?
“A. The only time I knew it was, I didn’t know who it was at the time but after I got away and stand back from him.
“Q. All right. And then what did you do?
“A. After, I got back he came back at me again just like this. He reached back at me again, that’s when I pulled the trigger, not realizing it, I was pulling the trigger.
“Q. All right. When he grabbed you the first time how did it affect you?
“A. Well, it scared me, it, honest, scared me, really, when he grabbed me it scared me because I didn’t know he was in there.
“Q. All right. Were you hurt in any way?
“A. No more than my neck.
“Q. How was your neck hurt?
“A. That’s when he was holding it, you know, he had, you know, the mug on me. We call it the mug when you are choking.
“Q. Tell these ladies and gentlemen what you mean by the ‘mug.’
“A. That means choking, you know, you got both hands and choking. I didn’t know that you know, talking about mug, just put your hands around.
“Q. All right. Was Bennie choking you?
“A. Yeah, he was choking me, definitely choking me.
“Q. O.K. When this happened did it leave any signs on your neck?
*985 “A. Well, just a little swelling on it, you know, wasn’t no splotches, you know, swelling, you know. That was mostly like, if you get your jaw hit and it rise up, something like that.
[[Image here]]
“A. Well, after I pulled the trigger, not realizing automatic pistol, and there happened to be one in the chamber and mostly when I shot not even knowing that I was shooting, after I shot him he stood up there with me for a while and I said, ‘Why did you do that?’ And ‘Why you grabbed me like that?’ He said, T was scared.’ I said, ‘Why you scared?’ He said, T was scared because I thought you knew I was in that closet and I was actually scared.’ And I said, ‘Let me take you to the hospital.’ That’s when he said, when he put his arms around me and I carried him out of her bedroom to those doors and that’s when he fell. He said, T can’t help you no more.’
“Q. Now, why did you pull that gun?
“A. Why did I pull it? I pulled it because I thought he was going back to choking me again.
[[Image here]]
“A. After that, at that particular time that’s when the ambulance and Sheriff’s Department come up. So, I was standing up at that side. My ear at that particular time when they pulled up, so I left after they got there I left.
“Q. Did you have any conversation before you left with anybody?
“A. Yeah, when I told Larry, and I told Joyce that was standing up there that I was going on because I had my work clothes on and I knew I was going to jail so I was going home to, I wanted to go to the jail house looking decent and not with work clothes on. So, I went home and pulled my work clothes off and put some decent clothes on to go to jail in.”
I.
By the first issue presented in appellant’s brief, it is contended that the trial court erred in admitting the written statement of Fannie Hoffman, who is characterized in appellant’s brief as the “primary witness” for the State, in an effort to impeach her as a witness. The particular statement is “State Exhibit — 1” which is in the typed form of “VOLUNTARY STATEMENT” and apparently signed by the same person who has hereinabove been referred to as Fannie Hoffman, but who, in her own handwriting apparently wrote and signed the statement as “Finnie Hoffman.” The statement is as follows:
“I, Finnie Hoffman was visiting my cousin Bennie Cole when Ned Johnson came up, I told him to go in the back room, because he had accuse me of going with him. See he came in and asked me was I going down to the house with him and I said yeah that is when I was in the living room and he walk in the back and ... [a short word that is illegible to the writer hereof] Bennie and I was going up to the house and I heard a shot. He said that Bennie was going out for something and that is when I called the police.”
Several pages of the brief of appellant’s attorney and several pages of appel-lee’s brief are devoted to this issue. Many more pages of the court reporter’s transcript of the proceedings were devoted to the same question, that is, whether State’s Exhibit 1 was admissible as evidence for the State in impeachment of Fannie Hoffman, the first witness called by the State. The attorneys for both parties on appeal deal extensively with the ramifications of the law as to various circumstances of an attempted impeachment by one party of his own witness, which we should discuss and determine whether the particular evidence considered was admissible if such a determination were material to a correct determination of this appeal. It probably would be but for the fact that the verdict of the jury and the judgment rendered thereon constitute an acquittal of the defendant as to murder, and State’s Exhibit 1 could have been harmful to defendant only as to whether defendant was guilty of murder. It was harmless, in our opinion, as to the issue of whether defendant was guilty of manslaughter. The admission in evidence *986 of State’s Exhibit 1 did not constitute error prejudicial to defendant.
II.
During the redirect examination of Deputy Sheriff Wadell Pearson, a witness for the State, the following occurred:
“Q. To your knowledge is there anything wrong with the defendant’s mind?
“MR. WILLIAMS [Defendant’s attorney]: We object ...
“THE COURT: .... Sustained.
“MR. WILLIAMS: Judge, could I approach the bench, one second.
“(The following motion was made at the bench out of the hearing of the jury).
“MR. WILLIAMS: Judge we move for a mistrial, that is a defense that has not been entered in this case and it is prejudicial to my client.
“THE COURT: I’m going to deny your motion for a mistrial.
“(The case then continued in the jury’s hearing.)
“THE COURT: Ladies and gentlemen, I have sustained an objection to a question asked by the District Attorney. Any time I sustain an objection to a question not only should you disregard any answer that might have been given but, in addition, you are to disregard any question that might have been asked.
“MR. WILLIAMS: We take an exception.
“THE COURT: You have your exception, yes sir.
“MR. JONES [Prosecuting attorney]:
“Q. Do you know who turned over this gas heater or chair or when it was turned over ?
“A. No, I do not.
“Q. Who was in the room when it was turned over?
“A. No, I do not know.
“MR. JONES: That’s all.
“RE-CROSS EXAMINATION”
In our opinion, the question to which defendant’s objection was made was improper and the court was not in error in sustaining the defendant’s objection and was not in error in overruling defendant’s motion for a mistrial. We do not believe the State gained anything before the jury by the question. The particular question does not come within the area of incidents that justify the granting of a motion for a mistrial.
III.
The third issue presented in appellant’s brief is stated as follows:
“THE EVIDENCE DID NOT SUSTAIN A CONVICTION OF MANSLAUGHTER AND THE COURT ERRED IN REFUSING DEFENDANT’S. REQUESTED JURY CHARGES 9, 10, 11, 12 AND 13, WHICH DEALT WITH SELF-DEFENSE.”
The issue is multifaceted. Nevertheless, we consider every facet of the issue.
The evidence was undisputed that the alleged victim was killed by a shot from the pistol in the possession of defendant. A jury issue was clearly presented as to whether defendant caused the death under one of the two alternatives of Alabama Criminal Code § 13A-6-3.
Each of defendant’s requested written charges, 9, 10, 11, 12 and 13, constituted good argument in favor of defendant, but its argumentative nature deprived it of the impartiality that instructions by the court to the jury, as well as all other judicial functions, should possess. The five charges involved composed two and a half pages of the transcript. We quote one of medium length, # 12:
“If the defendant had reasonable grounds to believe and actually did believe that he was in imminent danger of death or serious bodily harm, he would be justified in using force in self-defense, even though it may afterwards have turned out that the appearances were false. If these requirements are met he could use deadly force even though there was in fact no purpose on the part of the other person to kill him or to do him serious bodily harm, and even though *987 there was no actual necessity that deadly force be used in self-defense.”
The argumentative nature of each of such written charges justified its refusal. West’s Alabama Digest, Criminal Law, Key No. 807(1). In addition, we should note that the trial court fully covered in its oral charge the subject of the defense of self-defense interposed by defendant, including any and all applicable principles of law pertaining thereto found in any of defendant’s requested written charges refused by the court that were of material significance to the issue as to defendant’s guilt vel non of murder with which he was expressly charged in the indictment; they were of little, if any, material significance on the issue of whether he was guilty of the offense of which he was convicted, manslaughter, as defined by Alabama Criminal Code, § 13A-6-3. The trial court did not commit error prejudicial to defendant by the refusal of any of the specified written charges requested by defendant.
IV.
By the final issue presented in appellant’s brief, he contends that the trial court erred in “allowing the coroner to testify to the cause of death.” The first paragraph of appellant’s argument on the issue is as follows:
“Coroner Burton’s [Coroner of Macon County] testimony is found from R-88 to R-99. This testimony continues a policy in Macon County of having the Coroner determine and testify to the cause of death. The Defense objected to the Coroner giving his opinion based on his superficial examination, and the objection was sustained. The witness happened to be a licensed mortician, and he was offered as an expert witness, the Defense objected and this was sustained. The position of coroner requires no license or qualification, only to be elected.”
The last paragraph of the argument of appellant’s counsel on the issue is as follows:
“There have been many cases where coroners have made mistakes as to causes of death. There are many bodies being exhumed to later determine causes of death, due to oversights by coroners and morticians. Thus, the court erred in allowing the coroner to testify as to the cause of death.”
It is difficult for us to understand the basis for the presentation of this particular issue, but it would seem that for us to decide it would involve the decision of an immaterial issue between the parties, one that appears to be an academic issue merely, which we deem it appropriate for us to decline to decide. As there was overwhelming and undisputed evidence from qualified witnesses other than the Macon County Coroner that the cause of the victim’s death was the bullet fired from the pistol in the possession of defendant, the trial court committed no error prejudicial to defendant in permitting the introduction of the testimony of said Macon County Coroner to the effect that his examination of the body of the deceased led him to conclude that he had died from a bullet wound to his chest. The most definite evidence on the point by the particular witness was during his cross-examination by defendant’s attorney, as follows:
“Q. So you don’t know if he died of a heart attack or died of a gunshot wound, do you?
“A. He died from the gunshot wound.
“MR. WILLIAMS: I don’t have any other questions, Your Honor.
“MR. JONES: Nothing further, Your Honor.
“THE COURT: You may step down.”
Appellant’s fourth contention for a reversal is without merit.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
*988 All the Judges concur.
TYSON, J., concurs with an opinion.